WYLER, APPELLANT, *v.* TRIPI ET AL., APPELLEES.

(No. 69-611—Decided February 24, 1971.)

*Messrs. Amer, Cunningham, Cunningham, Brennan &
Miller* and *Mr. Richard T. Cunningham,* for appellant.
   *Messrs. Chastang & Carroll, Mr. Charles J. Chastang*
and *Messrs. Miller, Morris & Reece,* for appellees.


HERBERT, J.  R. C. 2305.11 provides, in pertinent part:
"An action for * * * malpractice * * * shall be brought
within one year after the cause thereof accrued * * * ."
   This dispute concerns the date upon which the statute
of limitations commences to run in a medical malpractice
case and necessitates a re-examination of this court's
holdings in *Gillette* v. *Tucker* (1902), 67 Ohio St. 106, 65
N. E. 865; *Bowers* v. *Santee* (1919), 99 Ohio St. 361, 124
N. E. 238; *DeLong* v. *Campbell* (1952), 157 Ohio St. 22, 104
N. E. 2d 177.
   As stated by Judge Stewart in the syllabus of *DeLong*
v. *Campbell, supra:*

"As to a cause of action for malpractice by a physician, the statute of limitations begins to run at the latest upon the termination of the physician-patient relationship whether, within the time limited by the statute, the act constituting malpractice is known or unknown by the one upon whom it was committed."

Appellant has urged this court to abandon the rule announced in our previous decisions and to adopt a rule that the statute of limitations for medical malpractice will not commence to run until the patient actually discovers, or reasonably should have discovered, the negligent act.

In jurisdictions which have considered this question, it has been recognized that in the construction of the statute of limitations pertaining to medical malpractice, the cases represent a conflict between two basic policies of the law, viz., the policy of discouraging the fostering of stale claims, and the policy of allowing meritorious claimants an opportunity to present their claims. *E. g., Billings* v. *Sisters of Mercy* (1964), 86 Idaho 485, 489, 389 P. 2d 224.

It is generally stated that a cause of action accrues when the wrongful act complained of is committed, and not as of the date the damage is discovered or reasonably should have been discovered. *E. g.*, 34 Ohio Jurisprudence 2d 536, Limitation of Actions, Section 58; 34 American Jurisprudence 94, Limitation of Actions, Section 115.

In some jurisdictions, the strict general rule that a cause of action accrues at the date of the alleged wrong is applied to medical malpractice cases. *E. g., Silvertooth* v. *Shallenberger* (1934), 49 Ga. App. 133, 174 S. E. 365; *Carter* v. *Harlan Hospital Assn.* (1936), 265 Ky. 452, 97 S. W. 2d 9; *Tantish* v. *Szendey* (1962), 158 Me. 228, 182 A. 2d 660; *Wilder* v. *St. Joseph Hospital* (1955), 225 Miss. 42, 82 So. 2d 651. However, in the early 1930's most courts began developing exceptions to the general rule in an attempt to avoid the harsh results which often arose under facts peculiar to medical malpractice cases. 32 Indiana L. J. 528, 529. For example, some courts now allow a plaintiff to sue for breach of contract so as to take advantage of a long-

er statute of limitations. *Sellers* v. *Noah* (1923), 209 Ala. 103, 95 So. 167. See, also, cases collected in 74 A. L. R. 1320, and 144 A. L. R. 215. Nevertheless, it is still the majority view that injuries sustained as a result of medical malpractice are *ex delicto* in nature and the statute of limitations for breach of contract is not applicable. See 80 A. L. R. 2d 320, 326. In other jurisdictions, a continuous treatment theory has been used by the courts in situations where a doctor leaves a foreign object in the body of a patient and continues to treat him after the operation. The physician is said to be negligent not only in his initial act, but also in allowing the object to remain in the patient's body while the patient is still under his care. According to this analysis, the statute of limitations does not begin to run until the patient leaves the care of the physician. *E. g., Hotelling* v. *Walther* (1942), 169 Ore. 559, 130 P. 2d 944. In some jurisdictions, the statute of limitations does not begin to run until discovery of the negligently caused condition, if the physician has fraudulently concealed his negligent conduct. *E. g., Crossett Health Center* v. *Croswell* (1953), 221 Ark. 874, 256 S. W. 2d 548: *Guy* v. *Schuldt* (1956), 236 Ind. 101, 138 N. E. 2d 891; *Lakeman* v. *La France* (1959), 102 N. H. 300, 156 A. 2d 123. Finally, a few jurisdictions have expanded the fraudulent concealment doctrine by finding *constructive* fraudulent concealment in the failure of the physician to inform the patient of the negligence, where the physician knew or should have known it occurred. *E. g., Morrison* v. *Acton* (1948), 68 Ariz. 27, 198 P. 2d 590; *Rosane* v. *Senger* (1944), 112 Colo. 363, 149 P. 2d 372; *Perrin* v. *Rodriguez* (La. App. 1934), 153 So. 555. Cf. *Seitz* v. *Jones* (Okla. 1961), 370 P. 2d 300.

This court, in the *Gillette, Bowers* and *DeLong* cases, has adopted the continuing negligence theory by stating that in all medical malpractice cases, the latest time at which the statute of limitations commences running is the time at which the physician-patient relationship finally terminates.

The justification given for the termination rule is that

it strengthens the physician-patient relationship. The patient may rely upon the doctor's ability until the relationship is terminated and the physician has the opportunity to give full treatment, including the immediate correction of any errors in judgment on his part. In short, it was thought that the termination rule is conducive to that mutual confidence which is essential to the physician-patient relationship. *Bowers* v. *Santee, supra.*

In situations such as the case at bar, where no injury or damage becomes apparent contemporaneously with the negligent act, the application of the general rule that a cause of action exists from the time the negligent act was committed would lead to the unconscionable result that the injured party's right to recovery can be barred by the statute of limitations before he is even aware of its existence. Although the termination rule is a marked departure from the general rule, and is designed to avoid the harsh results of that rule, it affords little relief in cases where the injury is one which requires a long developmental period before becoming dangerous and discoverable. In those situations, the termination rule extends the period of time at which the statute of limitations commences to run, but does so by a factor which bears no logical relationship to the injury incurred. See 30 Ohio State L. J. 425, 430. The termination rule is further fallible in that it requires the patient to determine, at the time the relationship is terminated, that malpractice has taken place, when in fact he may have relied upon the very advice which constitutes malpractice. *Johnson* v. *Caldwell* (1963), 371 Mich. 368, 123 N. W. 2d 785; *Ayers* v. *Morgan* (1959), 397 Pa. 282, 154 A. 2d 788.

Because the termination rule only relieves the peculiarly harsh results of the application of the medical malpractice statute of limitations in some instances, appellant suggests that this court should follow those jurisdictions which have adopted the discovery rule. There is a sharp conflict of authority on that issue in this country.

The courts in 21 states presently do not apply the dis-

covery rule, applying instead either the strict general rule or the exceptions to the general rule noted above.[1] Ten jurisdictions have adopted the discovery rule, but have specifically limited it to cases where a foreign object (surgical sponge, gauze, forceps, etc.) has been negligently left in the patient's body.[2] Eleven states have adopted the discovery rule for all malpractice cases regardless of whether a for-

[1]*Acton* v. *Morrison* (1945), 62 Ariz. 139, 155 P. 2d 782; *Crossett Health Center* v. *Croswell* (1953), 221 Ark. 874, 256 S. W. 2d 548; *Saffold* v. *Scarborough* (1955), 91 Ga. App. 628, 86 S. E. 2d 649; *Mosby* v. *Michael Reese Hospital* (1964), 49 Ill App. 2d 336, 199 N. E. 2d 633; *Guy* v. *Schuldt* (1956), 236 Ind. 101, 138 N. E. 2d 891; *Ogg* v. *Robb* (1917), 181 Iowa 145, 162 N. W. 217; *Waddell* v. *Woods* (1945), 160 Kan. 481, 163 P. 2d 348; *Carter* v. *Harlan Hospital Assn.* (1936), 265 Ky. 452, 97 S. W. 2d 9; *Tantish* v. *Szendey* (1962), 158 Me. 228, 182 A. 2d 660; *Pasquale* v. *Chandler* (1966), 350 Mass. 450, 215 N. E. 2d 319; *Wilder* v. *St. Joseph Hospital* (1955), 225 Miss. 42, 82 So. 2d 651; *Thatcher* v. *De Tar* (1943), 351 Mo. 603, 173 S. W. 2d 760 (see, also, Missouri Statutes, Section 516.40 [actions for malpractice must be brought within two years from the date of the act]); *Cloutier* v. *Kasheta* (1964), 105 N. H. 262, 197 A. 2d 627; *Shearin* v. *Lloyd* (1957), 246 N. C. 363, 98 S. E. 2d 508; *DeLong* v. *Campbell* (1952), 157 Ohio St. 22, 104 N. E. 2d 177; *Hinkle* v. *Hargens* (1957), 76 S. D. 520, 81 N. W. 2d 888; *Bodne* v. *Austin* (1928), 156 Tenn. 366, 2 S. W. 2d 104 (see, also, *Albert* v. *Sherman* [1934], 167 Tenn. 133, 67 S. W. 2d 140); *Murray* v. *Allen* (1931), 103 Vt. 373, 154 A. 678; *Hawks* v. *DeHart* (1966), 206 Va. 810, 146 S. E. 2d 187; *Lindquist* v. *Mullen* (1954), 45 Wash. 2d 675, 277 P. 2d 724; *Lotten* v. *O'Brien* (1911), 146 Wis. 258, 131 N. W. 361.

[2]*Davis* v. *Bonebrake* (1957), 135 Colo. 506, 313 P. 2d 982 (compare, *Rosane* v. *Senger* [1944], 112 Colo. 363, 149 P. 2d 372); *Layton* v. *Allen* (Del. 1968), 246 A. 2d 794; *Billings* v. *Sisters of Mercy* (1964), 86 Idaho 485, 389 P. 2d 224 (see *Owens* v. *White* [C. A. 9, 1967], 380 F. 2d 310, applying Idaho law); *Spath* v. *Morrow* (1962), 174 Neb. 38, 115 N. W. 2d 581; *Fernandi* v. *Strully* (1961), 35 N. J. 434, 173 A. 2d 277 (see, also, *Rothman* v. *Silber* [1966], 90 N. J. Sup. 22, 216 A. 2d 18); *Flanagan* v. *Mt. Eden General Hospital* (1969), 24 N. Y. 2d 427, 248 N. E. 2d 871; *Seitz* v. *Jones* (Okla. 1961), 370 P. 2d 300 (see *Lewis* v. *Owen* [C. A. 10, 1968], 395 F. 2d 537, applying Oklahoma law); *Gaddis* v. *Smith* (Tex. 1967), 417 S. W. 2d 577; *Christiansen* v. *Rees* (1968), 20 Utah 2d 199, 436 P. 2d 435, disapproving *Peteler* v. *Robinson* (1932), 81 Utah 535, 17 P. 2d 244; *Morgan* v. *Grace Hospital* (1965), 149 W. Va. 783, 144 S. E. 2d 156.

eign object is involved.[3] Two states have adopted the discovery rule by statute.[4]

Those jurisdictions which have adopted the discovery rule do not interpret its applicaton as nullifying one of the purposes of the statute of limitations. (It is difficult to maintain that the claimant has been "sleeping on his rights" when in fact he is unaware that he had such rights. See *Ayers* v. *Morgan* [1959], 397 Pa. 282, 154 A. 2d 788; *Morgan* v. *Grace Hospital* [1965], 149 W. Va. 783, 144 S. E. 2d 156.) Those courts view the discovery doctrine as being entirely consistent with the policy of the statute of limitations to prevent "stale claims."

Although an examination of the cases[5] reveals that there is much to recommend the adoption of the discovery

[3]*Stafford* v. *Shultz* (1954), 42 Cal. 2d 767, 270 P. 2d 1 (for a detailed explanation of the California rule and cases, see Louisell and Williams, Medical Malpractice, 388, footnote 78; 80 A. L. R. 2d 390-396, and 32 Indiana L. J. 528, 533, footnote 29); *Yoshizaki* v. *Hilo Hospital* (Haw. 1967), 433 P. 2d 220; *Springer* v. *Aetna Cas. & Surety Co.* (La. App. 1964), 169 So. 2d 171 (see *Phelps* v. *Donaldson* [1963], 243 La. 1118, 150 So. 2d 35; *Perrin* v. *Rodriguez* [La. App. 1934], 153 So. 555); *Waldman* v. *Rohrbaugh* (1966), 241 Md. 137, 215 A. 2d 825 (see *Hahn* v. *Claybrook* [1917], 130 Md. 179, 100 A. 83); *Johnson* v. *Caldwell* (1963), 371 Mich. 368, 123 N. W. 2d 785; *Grey* v. *Silver Bow County* (1967), 149 Mont. 213, 425 P. 2d 819, citing *Johnson* v. *St. Patrick's Hospital* (1966), 148 Mont. 125, 417 P. 2d 469; *Iverson* v. *Lancaster* (N. D. 1968), 158 N. W. 2d 507; *Berry* v. *Branner* (1966), 245 Ore. 307, 421 P. 2d 996, overruling *Vaughn* v. *Langmack* (1964), 236 Ore. 542, 390 P. 2d 142; *Ayers* v. *Morgan* (1959), 397 Pa. 282, 154 A. 2d 788; *Wilkinson* v. *Harrington* (R. I. 1968), 243 A. 2d 745. Cf. *Chrischilles* v. *Griswold* (1967), 260 Iowa 453, 150 N. W. 2d 94; *Urie* v. *Thompson* (1949), 337 U. S. 163, 93 L. Ed. 1282; *United States* v. *Reid* (C. A. 5, 1958), 251 F. 2d 691; *Brush Beryllium Co.* v. *Meckley* (C. A. 6, 1960), 284 F. 2d 797.

[4]Alabama Code, Title 7, Section 25(1); Connecticut General Statutes, Section 52-584.

[5]See cases cited in footnotes 2 and 3, *supra*. See, also, Louisell and Williams, Medical Malpractice, Chapter 13; 25 Washington and Lee L. Rev. 78; 29 U. of Pittsburgh L. Rev. 341; 30 Ohio State L. J. 425; 18 Western Reserve L. Rev. 1002; 17 Vanderbilt L. Rev. 1577; 47 Cornell L. Q. 339; 32 Indiana L. J. 528; 12 Wyoming L. J. 30; and 63 Harvard L. Rev. 1177.

rule, we reluctantly conclude that courts of Ohio should not decree such an adoption. We are convinced that to do so would place us in the obvious and untenable position of having not only legislated, but of having done so directly in the face of a clear and opposite legislative intent. Cf. *Pasquale* v. *Chandler* (1966), 350 Mass. 450, 215 N. E. 2d 319.

Statutes of limitation are designed to assure an end to litigation and to establish a state of stability and repose. It must be assumed that when the General Assembly enacts a statute of limitations it is aware that, although a stale claim may be meritorious, the statute will operate without reference to merit and will cut off the claim. Moreover, the General Assembly has often considered and left standing our interpretation of R. C. 2305.11, as announced in *Gillette, Bowers* and *DeLong*. In the 106th General Assembly (1965-66), House Bill No. 30 was introduced. In the 105th General Assembly (1963-64), House Bill No. 959 was introduced. Both bills would have amended R. C. 2305.-11, by increasing the limitation period for malpractice to two years. Neither bill survived the scrutiny of the committee to which it was referred. A similar fate befell House Bill No. 907, which was introduced in the 103rd General Assembly (1959-60), and was designed to eliminate the statute of limitations for malpractice.

The most significant expression of legislative position occurred in the 101st General Assembly (1955-56), less than three years after this court's decision in the *DeLong* case. In that session, House Bill No. 177 was introduced to add the following language to R. C. 2305.11:

"If the action is for malpractice the cause thereof shall not accrue until the malpractice is discovered."

House Bill No. 177, was rejected by the committee to which it was referred.

It should also be noted that although the General Assembly has refused to adopt the discovery rule for medical malpractice cases, it has nevertheless created certain exceptions to the general operation of various other statutes

of limitation. (Cf. *Mosby* v. *Michael Reese Hospital* [1964], 49 Ill. App. 2d 336, 199 N. E. 2d 633.) In R. C. 2305.15 and 2305.16, the General Assembly has provided that the statute of limitations is tolled if the person entitled to bring the action is under a legal disability, or if the person liable to an action departs or absconds from the state. Moreover, in R. C. 2305.09 the General Assembly specifically enacted a discovery rule "if the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property." Finally, under R. C. 2305.04, if a person is entitled to recover the title or possession of real property, but is under legal disability, the statute of limitations is tolled. Significantly and intentionally absent is any statutory provision to the effect that the lack of knowledge on the part of an injured party in a medical malpractice action operates to delay the commencement of the running of the statute of limitations. See *Townsend* v. *Eichelberger* (1894), 51 Ohio St. 213, 38 N. E. 207.

Where the discovery rule for medical malpractice cases has been adopted by statute, the legislatures placed an outside limit on the period of time within which the action may be brought. Alabama Code, Title 7, Section 25(1); Connecticut General Statutes, Section 52-584. Such legislative action reminds us that statutes of limitation are a legislative prerogative and are based upon important legislative policy. Cf. *LaBarbera* v. *Batsch* (1967), 10 Ohio St. 2d 106, 114, 227 N. E. 2d 55.

In consideration of the obvious and repeated disinclination of the General Assembly to amend its malpractice statute of limitations, we are compelled to adhere to our former decisions on the question and refrain from judicially adopting that which has so clearly been legislatively rejected.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., STERN and LEACH, JJ., concur.
SCHNEIDER, DUNCAN and CORRIGAN, JJ., dissent.

CORRIGAN, J., dissenting. This case brings before the court once against the question whether in an action for malpractice the statute of limitation begins to run, at the latest, at the termination of the physician-patient relationship or from the time the patient discovers the malpractice.

The statute of limitation applicable to medical malpractice, R. C. 2305.11, reads, in pertinent part:

"An action for * * * malpractice * * * shall be brought within one year after the cause thereof accrued * * *."

In applying that statute, this court, in *DeLong* v. *Campbell* (1952), 157 Ohio St. 22, held that:

"As to a cause of action for malpractice by a physician, the statute of limitations begins to run at the latest upon the termination of the physician-patient relationship whether, within the time limited by the statute, the act constituting malpractice is known or unknown by the one upon whom it was committed."

That interpretation of the statute of limitation in malpractice actions was followed in *Lundberg* v. *Bay View Hospital* (1963), 175 Ohio St. 133, wherein, at page 135, Judge Zimmerman summarized our holdings in such cases as follows:

"It is the established law of Ohio that the one-year statute of limitations as now contained in Section 2305.11, Revised Code, does not begin to run until a medical relationship has finally terminated. *Gillette* v. *Tucker,* 67 Ohio St. 106, 65 N. E. 865, 93 Am. St. Rep. 639; *Bowers* v. *Santee,* 99 Ohio St. 361, 124 N. E. 238; and *DeLong* v. *Campbell, Exrx.,* 157 Ohio St. 22, 104 N. E. 2d 177."

Plaintiff urges that we should now discard that interpretation and hold that the statute of limitation in actions for medical malpractice should not begin to run until the patient discovers or, in the exercise of reasonable care, should have discovered the malpractice.

It is noted at the outset that "in determining the proper event which starts the period of limitation running against a malpractice action, the courts are confronted with two conflicting policies, the policy of protecting a

practitioner against the danger of stale lawsuits * * * on the one hand, and, on the other hand, the policy of protecting patients against negligence of medical practitioners, which often is difficult to discover within the statutory period of limitation." 80 A. L. R. 2d 372.

In order to implement one of these policies courts must determine the event which starts the period of limitation running. Several elections are presented: "* * * the period may commence to run when a practitioner's wrongful act or omission occurred, or when such act or omission resulted in injury, or when the injury was, or by the exercise of reasonable diligence should have been, discovered, or, in the case of continuing treatment by the practitioner, when the treatment terminated." 80 A. L. R. 2d 373.

As already noted above, this court has been committed to the rule that the termination of the physician-patient relationship is the event which starts the running of the statute of limitation. *Gillette* v. *Tucker* (1902), 67 Ohio St. 106; *Bowers* v. *Santee* (1919), 99 Ohio St. 361; *Amstutz* v. *King* (1921), 103 Ohio St. 674; *Lundberg* v. *Bay View Hospital, supra* (175 Ohio St. 133).

The reason advanced for adopting that view was expressed in *Bowers*, as follows, at page 368:

"* * * The surgeon should have all reasonable time and opportunity to correct the evils which made the operation or treatment necessary, and even reasonable time and opportunity to correct the ordinary and usual mistakes incident to even skilled surgery. The doctrine announced here is conducive to that mutual confidence that is highly essential in the relation between surgeon and patient."

By adopting the termination of treatment rule this court avoided for the injured patient the harshness of the general rule that a cause of action accrues at the time the tortious act is committed. 34 Ohio Jurisprudence 2d 536, Limitation of Actions, Section 58. That general rule has been applied to malpractice cases. See annotations, 74 A. L. R. 1317; 144 A. L. R. 209; 80 A. L. R. 2d 368.

Seeking to lessen the severity of that general rule, courts have created various exceptions to it, including the termination of treatment rule. In Prosser on Torts (3 Ed.), 147, the author summarizes these developments as follows:

"* * * The older approach to such cases was a literal application of the statute to bar the action, regarding it as intended to protect the defendant not only against fictitious claims, but also against the difficulty of obtaining evidence after lapse of time even when he is confronted with a genuine one; and considering the hardship upon the plaintiff as merely part of the price to be paid for such protection. The obvious and flagrant injustice of such cases has led to the adoption of a series of transparent devices to get around the rule. Thus the negligent treatment, or at least the defendant's duty, are [sic] held to continue until the relation of physician and patient has ended; or the court finds fraudulent concealment of the damage, which tolls the running of the statute; or it finds 'constructive' fraud in silence with probable knowledge; or the failure to discover and remove the sponge or other foreign object left in the plaintiff's body is held to be 'continuing' negligence. Quite recently there have been a wave of decisions meeting the issue head-on, and holding that the statute will no longer be construed as intended to run until the plaintiff has in fact discovered that he has suffered injury, or by the exercise of reasonable diligence should have discovered it. * * *"

The decision must now be made as to whether to adhere to the termination of treatment rule or to adopt the rule that the statute does not begin to run, at the latest, until the patient discovers or, in the exercise of reasonable care, should have discovered the injury, which latter is the so-called discovery rule.

"* * * Simply and clearly stated the discovery rule is: The limitation statute or statutes in malpractice cases do not start to run until the date of discovery, or the date when, by the exercise of reasonable care, plaintiff should

have discovered the wrongful act." *Johnson* v. *Caldwell* (1963), 371 Mich. 368, 379, 123 N. W. 2d 785.

The discovery rule has been adopted in the following jurisdictions: *Yoshizaki* v. *Hilo Hospital* (1967), 50 Haw. 150, 433 P. 2d 220; *Waldman* v. *Rohrbaugh* (1966), 241 Md. 137, 215 A. 2d 825; *Johnson* v. *Caldwell, supra; Grey* v. *Silver Bow County* (1967), 149 Mont. 213, 425 P. 2d 819; *Iverson* v. *Lancaster* (N. D. 1968), 158 N. W. 2d 507; *Frohs* v. *Greene* (1969), 253 Ore. 1, 452 P. 2d 564; *Wilkinson* v. *Harrington* (R. I. 1968), 243 A. 2d 745; *Miami* v. *Brooks* (Fla. 1954), 70 S. 2d 306; *Acker* v. *Sorensen* (1969), 183 Neb. 866, 165 N. W. 2d 74.

It is apparent that, although the termination of treatment rule modifies to some extent the general rule that the statute of limitation begins to run at the time the tortious act is committed, it affords no relief to a patient whose injury is such that it is not discoverable until a time well beyond termination of treatment, but which is, nonetheless, the result of negligent treatment on the part of the physician. In such an instance the patient's right of action is cut off, even though the claim has merit and the patient had neither knowledge nor means of gaining knowledge that he had sustained injuries through the fault of the physician.

Such a result is patently unjust. It is the feeling of this member of the court that we should not again approve our former decisions holding that a cause of action for malpractice accrues, at the latest, when the physician-patient relationship finally terminates.

The statute of limitation under consideration, R. C. 2305.11, says nothing about such termination. I cannot conceive that the General Assembly intended such a limited construction of the word "accrues," which, in the present fact situation, would operate to deny civil redress or compensation to this plaintiff for a grievous wrong suffered allegedly at the hands of these licensed medical practitioners, because the effect of defendants' alleged malpractice did not become manifest to plaintiff until more than a year after the physician-patient relationship ended.

The word "accrue" comes directly from the French word "accru," which is the past participle of the verb, "accroitre," which, in turn, is derived from the Latin verb, "accrescere," meaning to increase. The word has been widely used in legal terminology in several senses, *i. e.*, one use is the employment of "accrue" as an intransitive verb, meaning to come into existence as an enforceable claim; another use is to vest as a right, as, a cause of action has accrued when the right to sue has become vested. Vested right means a settled right, a fixed right, or an absolute right.

The right this plaintiff has to be compensated for her injuries, allegedly suffered from defendants' malpractice, certainly could not become fixed, settled or absolute until she was aware of what defendants had done and how she had been damaged.

This did not become known to her until April 30, 1967, which was actually over 15 months after the physician-patient relationship with defendants was terminated.

Plaintiff's cause of action could not accrue to her, or come into existence as an enforceable claim, until she had knowledge, or reasonably should have discovered, that she was possessed of such a claim, and thus able to take steps to enforce or give effect to such claim.

In my view, she should not be arbitrarily and unjustly deprived of her right to redress for defendants' alleged wrong by reason of this court's interpretation of the word "accrue," as used in R. C. 2305.11, in the manner exemplified by our prior holdings.

I disapprove of such interpretation and would hold that under R. C. 2305.11 a cause of action for medical malpractice accrues, at the latest, when the effect of the alleged malpractice becomes manifest to the patient or when the malpractice reasonably should have been discovered by the patient.

It is contended by defendants that adoption of the discovery rule will, in effect, nullify the statute of limitation in malpractice cases and foster fraudulent claims. I do

not agree with either contention. The purpose of the statute of limitation is to prevent an injured party from asserting an existing claim where lack of diligence in prosecution of the claim operates to the detriment of the defendant. More familiarly, it is said that one may not "sleep on his rights." It cannot be said that a patient is "sleeping on his rights" when he is not even aware that he has suffered an injury at the hands of a physician. The statute of limitation, of course, retains its vitality under the discovery rule; it simply does not run until the injury is discovered or, in the exercise of reasonable care, should have been discovered.

Nor do I "believe that the danger of spurious claims is so great as to necessitate the infliction of injustice on persons having legitimate claims which were undiscoverable by the exercise of ordinary care prior to the lapse of" one year from the termination of treatment. *Frohs* v. *Greene, supra* (253 Ore. 1), at page 4.

If the discovery rule were to be adopted in malpractice cases, I would necessarily disapprove and overrule our previous holdings in *Gillette* v. *Tucker*, 67 Ohio St. 106; *Bowers* v. *Santee*, 99 Ohio St. 361; *Amstutz* v. *King*, 103 Ohio St. 674; and *DeLong* v. *Campbell*, 157 Ohio St. 22.

I would reverse the judgment of the Court of Appeals and remand the cause to the Court of Common Pleas for further proceedings.

SCHNEIDER and DUNCAN, JJ., concur in the foregoing dissenting opinion.